IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| TIWAN T. WILSON, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PWG-15-1448 |
| WEXFORD HEALTH SOURCES, INC., | * | |
| Defendant. | * | |
| | *** | |

## MEMORANDUM OPINION

Plaintiff Tiwan T. Wilson filed this complaint alleging that he has received insufficient and inappropriate medical care from Defendant Wexford Health Sources, Inc. ("Wexford"). Pending are Wexford's motion to seal and motion to dismiss or for summary judgment. ECF Nos. 9 & 10. Wilson was notified of his right to file an opposition in response to Wexford's dispositive motion and was advised of the consequences of failing to do so. *See* ECF Nos. 11 & 12. Wilson has filed nothing further, and the time to do so has passed. *See* Loc. R. 105.2(a). A hearing is unnecessary in this case. *See* Loc. R. 105.6. For the reasons stated below, the unopposed motion to dismiss or for summary judgment will be granted. Wexford's motion to seal Wilson's medical records, ECF No. 9, which contains his sensitive personal information, shall also be granted.

## I.    BACKGROUND

### A. Plaintiff's Allegations

Wilson alleges that he has been coughing up blood since January 21, 2013, and that on August 4, 2014, he filed an administrative remedy procedure complaint ("ARP") in an effort to

get help.  Compl. 5, ECF No. 1.  Although Wilson's ARP was dismissed on the grounds that he was already receiving medical care for his complaint, he states he was still experiencing chest pain and was coughing up blood.  *Id.*  He claims that medical staff at Eastern Correctional Institution ("Eastern") told him nothing was wrong with him.  *Id.*

After being transferred to Roxbury Correctional Institution ("Roxbury"), Wilson submitted sick call in an effort to get help for his complaints.  *Id.*  He states that as a result of his requests he was sent for a chest x-ray and CT scan.  *Id.* at 3.  Wilson was first informed that the problem stemmed from metal inside his chest, which he states was what he was told previously while he was at Eastern.  *Id.*  He claims that medical staff "still did nothing about it."  *Id.*

Wilson was sent back to the hospital for another test and states "they find (sic) out that [he is] suffering from lung disease."  *Id.*  Wilson believes this was the problem all along and that it was missed by medical staff at Eastern.  *Id.*  He further relates that he fears doctors at Roxbury are delaying proper treatment for his condition because he was told more tests would be required before surgery could be approved.  *Id.*  Wilson claims a doctor at Bon Secours Hospital informed him he would have to be sent to the University of Maryland where the original surgery on his chest was performed and his medical records are located.  *Id.*

Wilson further alleges that "black lines" have begun to appear inside his fingernails.  *Id.*  He states that a physician's assistant told him the black lines could be an indication of heart disease, while another told him it could be related to his lung disease.  *Id.*  He maintains that neither physician assistant did anything about the black lines, such as order further tests to determine the reason for the black lines.  *Id.*  Wilson claims he is not on any type of medication

2

to help with his lung disease or "whatever else [he] could be suffering from." *Id.*[1]

Wilson's request for relief seeks to "make Wexford . . . take responsibility and pay for their misdiagnosis and medical neglect." *Id.* at 4–5. He further asserts that Wexford misled the undersigned in a previous lawsuit and convinced the Court there was nothing wrong with him. *Id.* at 4. He seeks injunctive relief ordering appropriate medical care for his condition. *Id.*

## B. Defendant's Response

Wilson sued Wexford in this Court for substantially the same claim in 2013. *See Wilson v. Wexford*, Civil Action PWG-13-3539 (D. Md. filed Nov. 22, 2013) ("*Wilson I*"). In that case, it was established that Wilson had a history of chest and abdominal trauma from multiple gunshot and stab wounds. *See Wilson I Mem.* 3, *Wilson I*, ECF No. 16. For his complaints of coughing up blood, Wilson received diagnostic imaging tests that revealed fibrotic changes in the mid-to-lower lung area, decreased aeration of his right lung, and deformities of his ribs. *Id.* Additionally, evidence of prior surgeries, including surgical clips in his right lower lung, were noted. *Id.* At that time, Wilson's complaints included chronic chest pain, which was not related to cardiac or respiratory problems; hemoptysis or coughing up blood; shortness of breath; upper respiratory disease; pneumonia; and empyema (collection of pus or infection) in his lung. *Id.*

In his 2013 complaint, Wilson had alleged that he was denied medical treatment, including diagnostic testing, for his complaints and sought injunctive relief ordering treatment. *Id.* at 1. Evidence was produced that indicated Wilson had received diagnostic testing and was being treated for bronchiectasis, a condition in which damage to airways causes them to widen and become flabby and scarred. *Id.* at 3 & n.4. I further observed that:

---

[1]     Page four of Wilson's complaint is actually a continuation of his request for relief, which begins on page five.

It appears the request for the CT scan was generated on March 28, 2013, six months before the test was conducted. At that time, it was noted that Plaintiff was complaining of intermittent hemoptysis and there was a need to rule out bronchiectasis or pulmonary disease following his admittance to the prison infirmary. *Id.* at 112, 327. A chest x-ray taken two months prior to the request for a CT scan on January 28, 2013, revealed "post-traumatic changes." *Id.* at 323. On May 7, 2013, when Plaintiff was seen by Dr. Ashraf, it was noted that there were no signs or symptoms of hemoptysis or shortness of breath, prompting Ashraf to delay the CT scan. *Id.* at 128.

The bronchoscopy test requested by the Bon Secours pulmonary clinic was done on December 4, 2013. Those test results indicate that plaintiff has "a mild restrictive lung defect" with "mild decrease in diffusing capacity" which is interpreted as an "insignificant response to bronchodilator." *Id.* at 341. Plaintiff was given another bronchoscopy on February 7, 2014, which ruled out any presence of a tumor or other lesion. Operative Report 1–2, Def.'s Supp. Ex. 1, ECF No. 12-1. There was evidence of bronchiectasis with acute inflammation of the inner walls of Plaintiff's lungs; the surgeon noted that there was "splinter hemorrhages" when touched but that Plaintiff was not actively bleeding in his lungs. *Id.* at 1. The current plan of treatment for Plaintiff is stated in Dr. Jason Clem's affidavit as follows:

> The treatment for bronchiectasis is aimed at controlling infections and bronchial secretions, relieving airway obstruction, and preventing complications. Based on these findings . . . plaintiff is presently receiving appropriate care for his pulmonary conditions which includes Symbicort a corticosteroid inhaler used to reduce inflammation of the lung, Guaifenesin an expectorant to thin and loosen mucus production and chest congestion and cough tabs.

> Plaintiff will continue to be regularly followed for his pulmonary issues as a chronic care patient to monitor his condition and the effectiveness of his treatment plan in controlling his symptoms associated with his bronchiectasis, bronchitis and recurrent hemoptysis.

> Chem Supp. Aff. ¶¶ 6–7, Def.'s Supp. Ex. 2, ECF No. 12-2.

*Wilson I* Mem. 5–6.

Since that time, Defendant, states that Wilson continues to receive treatment for his lung and respiratory issues, including prescribed medications to address his symptoms. The medications provided to address Wilson's respiratory issues include Qvar (an inhaled

corticosteroid that decreases irritation and swelling in the airways); Nasacort AQ (a steroid that prevents the release of substances in the body that cause inflammation); Prinvil (a drug used to treat heart disease and hypertension); Metoprolol Tartrate (a beta blocker used to treat chest pain and high blood pressure); Ventolin HFA (a bronchodilator that relaxes muscles in the airways to allow increased air flow to the lungs); cough drops; Pneumovax 23 (a vaccine to prevent streptococcus pneumoniae bacteria); and Benztropine Mesylate (used to reduce the effects of certain chemicals in the body that may become unbalanced as a result of disease, drug therapy, or other causes). *See* Def.'s Mem. 4–5 & n. 5, 6, 8, 12, 14, & 15, ECF No. 10-1; Clem Aff. 2–4, Def.'s Mem., Ex. 2, ECF No. 10-5.

Wilson was sent to Bon Secours Hospital on March 11, 2015, where he was seen by Dr. Surjit Julka. Clem Aff. 2. Dr. Julka determined after his physical examination of Wilson, that his hemoptysis was likely caused by bronchiectasis but needed to rule out bronchopleural fistula. *Id.* at 2–3. To that end, a CT scan of Wilson's chest was performed. The results of the scan indicated "extensive changes in the posterior right hemithorax related to old trauma and surgery" as well as "[e]xtensive rib deformity associated with diffuse pleural thickening and calcification." *Id.* at 3. No distinct bronchopleural fistula was seen, but Dr. Julka still suspected one might be present and recommended Wilson undergo pulmonary function tests and prescribed Albuterol as needed. *Id.* The pulmonary function test was performed at Bon Secours Hospital on April 16, 2015. *Id.*

On July 1, 2015, Wilson was seen by Dr. Colin Ottey, the regional medical director, and Wilson's pulmonary function test results were reviewed with him. *Id.* Wilson told Dr. Ottey that he was experiencing right-sided chest pain that radiates to his back, which he rated at a nine out of ten level of pain. *Id.* He also told Dr. Ottey that he was coughing up brown sputum over

the past month and experienced shortness of breath, wheezing, and fatigue after walking one-hundred yards. *Id.* at 3–4. Based on Wilson's reports, Dr. Ottey noted that Wilson's pulmonary doctor would be contacted for further discussion and follow-up. *Id.* at 4. Dr. Ottey did not observe Wilson to be in apparent distress but noted breath sounds in his right upper respiratory tract was decreased. *Id.*

Defendant asserts that Wilson's complaint is barred by the doctrine of *res judicata* in light of my prior decision granting summary judgment in Wexford's favor in *Wilson I.* Additionally, Defendant asserts that the complaint fails to state a constitutional claim based on the undisputed material facts. Def.'s Mem 10, 12.

## II.    STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.

*Id.* "In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Downing v. Baltimore City Bd. of School Comm'rs*, No. RDB 12-1047, 2015 WL 1186430, at *1 (D. Md. Mar. 13, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). Defendant's motion is unopposed.

### B. *Res Judicata*

*Res judicata* "'bars a party from suing on a claim that has already been litigated to a final judgment by that party or such party's privies and precludes the assertion by such parties of any legal theory, cause of action, or defense which could have been asserted in that action.'" *Reid v. New Century Mortg. Corp.*, No. AW-12-2083, 2012 WL 6562887, at *3 (D. Md. Dec. 13, 2012) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (citation and internal quotation marks omitted). When considering this defense, "'a court may take judicial notice of facts from a prior judicial proceeding when the *res judicata* defense raises no disputed issue of fact.'" *Kalos*, 2012 WL 6210117, at *2 (quoting *Andrews*, 201 F.3d at 524 n.1). *Res judicata* provides grounds for dismissal if a defendant establishes "'(1) a judgment on the merits in a prior suit resolving (2) claims by the same parties or their privies, and (3) a subsequent suit based on the same cause of action.'" *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (quoting *Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 42 (4th Cir. 1990)). Even if the plaintiff's legal theory differed in the earlier dispute, the doctrine of *res judicata* still bars the current action, provided that "the second suit 'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment.'" *Id.* (quoting *Aliff*, 914 F.2d at 42). Further,

> The preclusive [e]ffect of a prior judgment extends beyond claims or defenses actually presented in previous litigation, for "[n]ot only does *res judicata* bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of

whether they were asserted or determined in the prior proceeding." *Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F.2d 355, 359 (4th Cir. 1989), quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979) (internal quotation marks omitted).

*Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir. 1991).

## III.   ANALYSIS

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to "deliberate indifference to serious medical needs." *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> Deliberate indifference is a very high standard—a showing of mere negligence will not meet it. ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.

*Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

8

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

In his prior complaint, Wilson sought, as he does here, injunctive relief based on his claim his serious medical need was being ignored by the same Defendant named in the instant complaint. I found that while Wilson's medical condition was objectively serious, the care being provided to him did not amount to deliberate indifference. Wilson's allegations and the underlying, undisputed facts concerning the continuing care he is provided are unchanged from those established in *Wilson I*. His assertion that he is receiving no medication for his lung condition is unfounded and unsupported by the record; thus, there appears to be no change in the status of the medical care being provided to Wilson, which this Court found to be constitutionally adequate. The claim is barred by *res judicata*, but to the extent the complaint raises claims regarding the quality of ongoing care, the record evidence demonstrates that care is

constitutionally adequate.  The complaint must therefore be dismissed by separate Order which

follows.

_O 50¿2⁄16_
Date

_Paul W. Grimm_
Paul W. Grimm
United States District Judge